**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

_____

STACY PATRICK                                    CIVIL ACTION NO. 18-0738

VERSUS                                           JUDGE DONALD E. WALTER

WALMART INC.                                     MAGISTRATE JUDGE HAYES

_____

## <u>MEMORANDUM RULING</u>

Before the Court is a Motion for Summary Judgment filed by Defendant, Walmart Inc.

("Walmart").  <u>See</u> Record Document 19.  Plaintiff, Stacy Patrick ("Patrick"), opposes the

motion.  <u>See</u> Record Document 27.  For the reasons assigned herein, Walmart's motion is hereby

**GRANTED**.[1]

## BACKGROUND INFORMATION

Plaintiff, a white female, is a former employee of Walmart.  <u>See</u> Record Document 1 at

¶¶5-6.  She was hired as an Assistant Manager Trainee in August 2014, which is a first-level

salaried position.  <u>See</u> Record Document 19-5 at ¶¶2, 4.  After completion of an eight-week

training course, she was placed at Store No. 278 in Shreveport, Louisiana.  <u>See id.</u> at ¶2.

Plaintiff was one of eight salaried Assistant Managers at Store 278.  <u>See id.</u> at ¶4.  She reported

to four Co-Managers including Sparkle Tims ("Tims") and Chrissy Thomas ("Thomas"), and to

the Store Manager, Tracie Broussard ("Broussard").  <u>See id.</u>; Patrick Dep. at 128.[2]  Store 278 is

_____

[1]  Before reaching this decision, the Court reviewed in camera the documents submitted under
seal by Walmart and determined that the documents do not affect the Court's decision on
Walmart's motion for summary judgment.  <u>See</u> Record Documents 23, 26.

[2]  The parties have presented different pages of the same depositions in support of their positions,
which are found in numerous docket filings.  For ease of reference, the Court will cite to
deposition testimony using the individual's last name.

part of a "market" comprised of ten stores, which are managed by a Market Manager and Market Human Resources Manager. See Record Document 19-5 at ¶5.

As an Assistant Manager, Plaintiff was placed in supervisory positions throughout the store, including various merchandise departments, the front end of the store, and the receiving area in the back of the store. See id. at ¶7. Plaintiff's 2015 and 2016 performance reviews indicate that she was considered a "solid performer." See Record Document 19-2, Ex. D. However, Plaintiff received two "coachings" (i.e. disciplinary actions) after a customer service complaint and a minor violation of a Walmart policy. See Record Document 19-2, Ex. E.[3]

In February 2016, Plaintiff was rotated to manage the receiving area of the store where she oversaw approximately fifteen "unloaders" or CAP Team associates. See Record Document 19-5 at ¶22. The CAP Team was responsible for unloading merchandise from trucks in the back of the store, and was divided into two groups, each with a leader. See Record Document 1 at ¶8.

Plaintiff testified that her team was excited to have her as a manager when she first arrived, but she began having problems when she was tasked with training two individuals who would become leaders of the two CAP Team groups. See Patrick Dep. at 77, 81. Dominic O'Neal ("O'Neal") was one of the associates originally chosen for training. See id. at 84. However, Plaintiff testified that she was told by Broussard to stop training O'Neal after Broussard and co-manager Thomas observed O'Neal throwing boxes around in a fit of anger. See id. Plaintiff testified that when she informed O'Neal that she could no longer train him he called her a "fat bitch" and another employee who was standing beside her, Latasha Player

---

[3] "Coaching for improvement" is the term Walmart uses to describe its formal disciplinary protocol. A "coaching" provides feedback to an employee when his/her job performance fails to meet Walmart's expected standards or if an employee violates a company policy. See Record Document 19-3, Ex. I.

("Player")[4], a "dyke bitch." <u>See id.</u> at 85. Plaintiff stated that O'Neal also said he was "going to get both of y'all bitches in line," which Plaintiff perceived as a threat. <u>See id.</u> at 85, 88. Player provided a similar account of O'Neal's actions, and stated that she also felt threatened. <u>See</u> Player Dep. at 50.

Plaintiff testified that she instructed O'Neal to go home and cool off. <u>See</u> Patrick Dep. at 86. When O'Neal refused to leave work Plaintiff enlisted the help of Co-Manager Thomas and Perry Johnson ("Johnson") to assist with the situation. <u>See id.</u> According to Plaintiff, O'Neal was cursing during the meeting and allegedly said in a loud and angry tone "y'all are giving men's jobs to women." <u>See id.</u> at 86-87. Johnson provided a conflicting account, stating that he has no recollection of O'Neal making such a comment. <u>See</u> Johnson Dep. at 16-17, 29-30. Thomas also testified that she does not recall O'Neal making the "man's job" comment. <u>See</u> Thomas Dep. at 33.

According to the Plaintiff, Thomas did not discipline O'Neal or send him home, which provided O'Neal with the opportunity to continue harassing her. <u>See</u> Patrick Dep. at 86. In response, Plaintiff left work and sent a text message to Broussard to let her know she was going home. <u>See id.</u> at 87; Record Document 19-3, Ex. N. Broussard told Plaintiff that she needed to return to work, stating that she would look into the incident the next day. <u>See id.</u>

Plaintiff testified that after this incident O'Neal became more aggressive towards her. <u>See</u> Patrick Dep. at 128. She recalls O'Neal referring to her as a "fat bitch" under his breath on at least ten occasions when she would walk past him. <u>See id.</u> at 151. Plaintiff testified that O'Neal never said anything of a racial or sexual nature to her other than his comment that she gave a "man's job" to a woman. <u>See id.</u> at 171.

---

[4] Latasha Player was selected to replace O'Neal to train as a CAP Team leader. <u>See</u> Record Document 1 at ¶10.

Plaintiff testified that about 75% of the team members, both male and female, used offensive language on the job.  See id. at 128.   Plaintiff also testified that the language became worse after the incident with O'Neal, although it was not directed towards her.   See id. at 128-130.[5]   She instructed her team to stop using the language, but they did not comply.  See id. at 129.   Plaintiff testified that she reported to Broussard that her team members were using profanity, disrespecting other employees who walked to the back of the store to empty trash, and were "trying to holler" at female employees who walked to the back of the store.  See id. at 130.  She did not provide Broussard with specific examples of the language being used.   See id.  Plaintiff stated that in response Broussard held a meeting with the employees in question, but it did not curtail the use of bad language.   See id.   Broussard testified that she held a personnel meeting with the CAP 2 Team, but it only addressed the team's performance and issues with listening to the Plaintiff's instructions.  See Broussard Dep. at 49-50, 54.[6]

On June 17, 2016, Plaintiff's team refused to unload a truck as instructed and instead sat down as if they were going on strike.  See Patrick Dep. at 152.  In response, Plaintiff enlisted the help of Co-Manager Tims, who spoke to the employees out of Plaintiff's presence.  See id.  Tims testified that the employees said that they felt unappreciated by management and complained about being asked to unload a truck in a certain amount of time.  See Tims Dep. at 28.  The employees then complained to Tims that Plaintiff used the "n" word when speaking to them.  See

---

[5] Patrick provided examples of the offensive language, which included "pussy-ass niggas," "you bitch-ass niggas," and "fuck you, nigga."  See Patrick Dep. at 129.

[6] Broussard was deposed twice.  All references herein refer to the deposition dated February 8, 2019.

Tims Dep. at 28, 36; Patrick Dep. at 209-210.[7] Tims immediately called Broussard to report the information.  See Tims Dep. at 28.

Broussard responded by calling Walmart's Global Ethics office, and on June 22, 2016, a formal complaint was initiated on behalf of the unloaders working under Plaintiff.  See Record Document 19-4, Ex. S.[8]  Broussard testified that she submitted the complaint to Global Ethics because that is the proper procedure.  See Broussard Dep. at 69.  Broussard worked with Junior Zuniga ("Zuniga"), the Global and Ethics Compliance Manager, and Michael Carlton, Market Human Resources Manager, to investigate the complaint.  See Zuniga Dep. at 14.  Broussard was instructed by Global Ethics to gather written statements from the team members working under Plaintiff.  See Record Document 19-4, Ex. S; Broussard Dep. at 70-71.  Several of the statements indicated that Plaintiff used the "n" word or "nigga" in front of them.  See Record Document 19-4, Ex. S.  When Plaintiff was questioned about the allegations, she provided a written statement indicating that she only used the term in an effort to correct her team of unloaders by stating: "nigga, nigga, nigga, that's all I hear back here. I'm sick of hearing nigga. Stop saying it."  See Patrick Dep. at 154; Record Document 1 at ¶16; Record Document 27-7 at 39.  Plaintiff denied saying "nigga" on any other occasion.  See Patrick Dep. at 157.  She speculated that the employees who complained about her use of the "n" word did so in an effort to have her moved out of her supervisory position over the back of the store.  See id. at 182.

---

[7] The "n" word in this case refers to "nigga."

[8] During the investigation, Plaintiff was moved to a different part of the store for her safety.  See Broussard Dep. at 90-91.  Plaintiff was expected to continue making the schedules for her team of unloaders, but she was told not to discipline the employees for the time being.  See id.

The ethics investigation determined that there was evidence to substantiate the allegations of Plaintiff's use of the "n" word. See Zuniga Dep. at 47-48.[9] Zuniga recommended that Plaintiff be disciplined in the range of a second written warning up to termination, which was consistent with discipline for similar behavior in the past. See id. at 55. A final decision was made to terminate Plaintiff due to the seriousness of the offense and her disciplinary record at Walmart, which included two active coachings.[10] Plaintiff was terminated on July 27, 2016. See Patrick Dep. at 176.

In the interim, on June 23, 2016, Plaintiff had another confrontation with O'Neal. See Record Document 1 at ¶17. O'Neal received a coaching from another manager for eating on the job, and then allegedly yelled in Plaintiff's face, stating: "that's a bunch of BS that y'all going to snitch – so y'all snitching on me. I'm going home. F this. F that. F y'all. F. Walmart." See Patrick Dep. at 168-169. Plaintiff testified that O'Neal was standing so close to her that he spit on her face when speaking to her. See id. at 169. Plaintiff alleged that O'Neal did not receive a coaching for this outburst. See Record Document 1 at ¶17.[11]

_____

[9] Player told Broussard that everyone in the back of the store used the "n" word, but the other employees refused to confirm the names of anyone else who used the term. See Broussard Dep. at 73, 91-93. Player also verified Plaintiff's use of the term when talking about her male friends outside of work. See Record Document 19-4, Ex. S. The investigation also determined that several team members were making "gay jokes" towards an unloader, which resulted in retraining on Walmart's Discrimination and Harassment Prevention Policy. See Zuniga Dep. at 49.

[10] The record presents conflicting evidence as to who made the ultimate decision to terminate Plaintiff. Zuniga testified that Broussard and the Market Human Resources Manager made the decision after receiving his input. See Zuniga Dep. at 75, 78. Walmart has also admitted that Zuniga did not have the authority to discharge an assistant store manager. See Record Document 27-10, Ex. 102. Conversely, Broussard testified that she left the decision up to the Global Ethics office because she wanted the decision to be made fairly. See Broussard Dep. at 103, 109-110.

[11] O'Neal was eventually terminated from Walmart for getting into a fight with another employee. See Williams Dep. at 32.

On the following day, June 24, 2016, Plaintiff contacted Walmart's Global Ethics line directly and filed a report. See Record Document 19-4, Ex. AA. Therein, Plaintiff stated that her employees were using profanity and were argumentative towards her. See id. She also stated that her employees were "very intimidating" which made her feel "extremely uncomfortable." See id. She requested a transfer to a different location because she "did not feel safe." See id. She indicated that no threats of violence had been made toward her, but "the work environment is extremely hostile." See id. Plaintiff testified that she filed the complaint because she felt uncomfortable around O'Neal, she was receiving dirty looks from her staff, and she was concerned because another manager had the window to his truck broken out. See Patrick Dep. at 134-135.[12] The Global Ethics office sent Plaintiff's complaint to Broussard to investigate because it did not raise issues related to Walmart's discrimination and harassment prevention policy. See Zuniga Dep. at 62-63.

Broussard testified that she did not have the authority to unilaterally transfer Plaintiff to another store, so she set up a meeting for Plaintiff with the Market Manager who could authorize the transfer. See Broussard Dep. at 121-122. However, Plaintiff had already been moved to a different part of her current store because of the pending investigation against her. See id. at 90-91. Broussard testified that she helped Plaintiff request a transfer because Plaintiff indicated she did not feel safe, but denied that Plaintiff told her that O'Neal threatened her. See id. at 98. Plaintiff met with the Market Manager about the transfer and communicated her confusion about her current job responsibilities. See Patrick Dep. at 175. The Market Manager told her to continue working the front of the store for the time being. See id.

---

[12] Broussard testified that she believed the window-bashing incident involved an issue with an employee who was dating several women in the store at the same time. See Broussard Dep. at 121.

On September 27, 2016, Plaintiff filed an official charge with the EEOC alleging race and gender discrimination and retaliation.  See Record Document 19-5 at ¶62; Record Document 19-4, Ex. BB.  On March 12, 2018, the EEOC dismissed the charge and issued Plaintiff notice of her right to sue.  See Record Document 19-5 at ¶65; Ex. CC.    On June 4, 2018, Plaintiff filed this lawsuit wherein she alleges that she was subjected to a racially hostile work environment and terminated in violation of Title VII and 42 U.S.C. § 1981.  See Record Document 1 at ¶¶22-23.    She also alleges that she was subjected to a sexually hostile work environment and terminated in violation of Title VII.  See id. at ¶¶25-26.  Finally, Plaintiff alleges that Walmart retaliated by terminating her employment after she reported a racially and sexually hostile work environment in violation of Title VII.  See id. at ¶¶28-29.   Walmart denies these allegations, maintains that Plaintiff was terminated for cause, and moves for the dismissal of all of her claims.  See Record Document 4; Record Document 19.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." [13]   Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986).  When the burden at trial will rest on the non-moving party, the moving party need not produce

---

[13]  Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this Court will rely on it accordingly.

evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. See Celotex, 477 U.S. at 322-323.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact with the motion for summary judgment, the nonmovant must demonstrate that there is, in fact, a genuine issue for dispute at trial by going "beyond the pleadings" and designating specific facts for support. Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,'" by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence. Id. (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986)). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1985) (internal citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986) (the court must "review the facts drawing all inferences most favorable to the party opposing the motion"). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so weak and tenuous that it could not support a judgment in the nonmovant's favor. See Little, 37 F.3d at 1075.

Additionally, Local Rule 56.1 requires the moving party to file a statement of material facts as to which it contends there is no genuine issue to be tried. Pursuant to Local Rule 56.2, the party opposing the motion for summary judgment must set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." All material facts set forth in the statement required to be served by the moving party "will be deemed

admitted, for purposes of the motion, unless controverted as required by this rule." Local Rule 56.2.

## LAW AND ANALYSIS

### I.  Title VII Race discrimination related to termination[14]

Plaintiff alleges that she was terminated because of her race in violation of Title VII.  <u>See</u> Record Document 1 at ¶¶22-23.    Title VII makes it unlawful to discharge, refuse to hire, or discriminate against any individual because of an individual's race, color, religion, sex, or national origin.  <u>See</u> 42 U.S.C. § 2000e-2(a)(1).    To establish a prima facie case of race discrimination a plaintiff must produce evidence that: (1) she is a member of a protected class; (2) she was qualified for her position; (3) she was subjected to an adverse employment action; and (4) she was replaced by someone outside of the protected class, or, in the case of disparate treatment, that other similarly situated employees were treated more favorably.  <u>See</u> <u>Okoye v. Univ. of Tex. Houston Health Sciences Ctr.</u>, 245 F.3d 507, 512-13 (5th Cir. 2001).[15]    "When a workforce rule violation is the apparent reason for the adverse employment action, a Title VII plaintiff may establish a prima facie case by showing either that [s]he did not violate the rule, or that, if [s]he did, employees outside of the plaintiff's protected class who engaged in similar acts were not punished similarly."  <u>Anderson v. McDonald's Rests. of La., Inc.</u>, 2012 WL 5878731, at *5 (E.D. La. Nov. 21, 2012) (quoting <u>Mayberry v. Vought Aircraft Co.</u>, 55 F.3d 1086, 1090

---

[14]  As noted above, Plaintiff also claims that she was terminated due to her gender in violation of Title VII.  Plaintiff's opposition did not address Defendant's motion on this point.  As such, this claim is **DISMISSED**.

[15]  A prima facie case under section 1981 is the same as Title VII, and requires a plaintiff to establish that she: (1) is a member of a protected group, (2) was qualified for the position held, (3) was discharged from the position, and (4) was replaced by persons outside of the protected group or was treated differently from others similarly situated.  <u>See</u> <u>Wheeler v. BL Dev. Corp.</u>, 415 F.3d 399, 405 (5th Cir. 2005).

(5th Cir. 1995)). The comparator employees must have been treated differently (more favorably) under "nearly identical" circumstances. See id.

If the prima facie case is met the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employee's termination. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817 (1973). If the employer meets this burden the plaintiff must then demonstrate that the given reason was pretextual by showing either a discriminatory reason is more likely or the employer's proffered explanation is unworthy of credence. See Tex. Dep't of Cmt. Affairs v. Burdine, 450 U.S. 248, 256, 101 S.Ct. 1089 (1981).

In this case, only the fourth element of the prima facie case is at issue. Plaintiff alleges that she was treated differently (more harshly) than other employees because she was terminated for her use of the "n" word while others outside of her protected class used the term and were not disciplined. See Record Document 27 at 5-14. Walmart argues that Plaintiff cannot establish a prima facie case because her situation was not "nearly identical" to that of the unloaders who may have also used the term. See Record Document 19-1 at 17. Walmart notes that Plaintiff was a salaried member of management while the unloaders were entry-level hourly associates and the two are held to different accountability guidelines. See id. at 18. Walmart also argues that Plaintiff has not provided evidence to establish that the unloaders had a similar disciplinary record (coaching level) as she did at the time of her termination. See id. Finally, Walmart argues that Plaintiff's use of the "n" word as a white member of management is different and potentially far more offensive than the use of the word by the African American unloaders. See id. at 18-19.

Plaintiff argues that management was aware that the unloaders were using the "n" word, but did not discipline them. See Record Document 27 at 5. Plaintiff notes that Rebecca

Williams ("Williams"), another Assistant Store Manager, was aware of the use of the phrase "bitch-ass nigga" by O'Neal. See id. at 6. Plaintiff also notes that Player heard the unloaders use the "n" word amongst each other everyday, and she reported this to Thomas, Williams, and Broussard. See id. Moreover, Plaintiff also argues that the discipline for the use of the "n" word is the same for associates and managers. See id. at 5. Plaintiff notes that Global Ethics Manager Zuniga testified that the discipline for repeated racial slurs not directed towards a specific individual is the same for both hourly and managerial employees. See id. at 8.

The evidence before the Court reveals that at least one member of management was aware that the "n" word was being used by the unloaders. Williams testified that the unloaders used inappropriate language including the phrase "bitch-ass nigga," referred to women as "bitches" and "hos," and she recalled that O'Neal called Player a "dyke." See Williams Dep. at 18-20. Williams also stated that the unloaders referred to each other as "nigga" as frequently as 40 percent of the time she was in the room, and used general profanity about eighty percent of the time. See id. at 28. Williams testified that she reported this information to Thomas and Tims on more than one occasion. See id. at 20. For their part, Thomas and Tims both deny hearing reports of bad language or witnessing it themselves, other than the report against Plaintiff for her use of the "n" word. See Tims Dep. at 19, 24-26, 37, 68-69; Thomas Dep. at 27, 41-42, 44-45. Player testified that she reported the use of profanity to Thomas multiple times. See Player Dep. at 20, 27-29. Player also testified that she heard the unloaders use the "n" word all the time," and "it's every day … that's how they talk to each other." See Player Dep. at 34-35. She testified that she reported the use of profanity to Broussard, who responded by holding a meeting with the entire team to discuss the use of inappropriate language. See Player

Dep. at 37-38. Broussard denied that she received reports of inappropriate language. See Broussard Dep. at 49-50, 54.

All of the above suggests to the Court that a fact issue exists as to whether Plaintiff was treated more harshly than the unloaders for her use of the "n" word. However, the Court must also consider whether Plaintiff was treated more harshly than her comparators under "nearly identical" circumstances. In this respect, the Court finds that the differences between the two are too great. First, Plaintiff was a member of management with the power to discipline her employees as compared to the hourly unloaders in her charge. Moreover, the Court cannot ignore the race of Plaintiff and the unloaders. Plaintiff, a white member of management, admits to the use of the "n" word amongst her subordinate African American employees. The comparator unloaders are hourly African American workers who used the term in conversation amongst each other. To say that the circumstances between the two are nearly identical ignores the obvious, that a white supervisor using the "n" word is likely more offensive than its use by the unloaders.[16]

However, even if the Court were to assume that Plaintiff could establish a prima facie case, Walmart has provided a legitimate, nondiscriminatory reason for her termination – the substantiated use of the term "nigga" in connection with her disciplinary record. See Record Document 19-1 at 16. The burden shifts to Plaintiff to demonstrate that Walmart's proffered reason is not true, but is instead a pretext for intentional discrimination. See Price v. Fed. Exp., Corp., 283 F.3d 715, 720 (5th Cir. 2002). Plaintiff is required to substantiate her claim of pretext "through evidence demonstrating that discrimination lay at the heart of the employer's

_____

[16] Plaintiff testified that she believes there is no difference in her saying "nigga" because she is "no different than them," noting that she lives the same lifestyle, was raised in "the projects" and "all I know is black people." See Patrick Dep. at 196-197.

decision." Id. (citing Rubinstein v. Adm'rs. of the Tulane Educ. Fund, 218 F.3d 392, 400 (5th Cir. 2000)).

Plaintiff has not provided the Court with evidence to suggest that discrimination on the basis of race lay at the heart of Walmart's decision to terminate her employment. Rather, Plaintiff's deposition testimony indicates she believes that she was terminated because Broussard wanted to show support to the assistant manager who reported Plaintiff's use of the "n" word. See Patrick Dep. at 186, 196. Plaintiff also testified that she heard from other employees that Broussard didn't like her and was heard saying "Oh, God, she's got to go." See id. at 184. Plaintiff's affidavit indicates she heard that Broussard said "that ho got to go." See Record Document 27-8 at ¶ 12. None of this information indicates that Plaintiff's termination was due to her race.

Accordingly, the Court finds that Plaintiff has failed to provide any evidence to suggest that Walmart's explanation for her termination was pretextual. Plaintiff's claim for Title VII race discrimination based on her termination must be dismissed. Because the standard under section 1981 follows that of Title VII, that claim must also be dismissed.

## II.     Title VII Hostile Work Environment

Title VII makes it unlawful for an employer to discriminate against any individual with respect to "the terms, conditions, or privileges of employment" because of an individual's race, religion, sex, or national origin. See 42 U.S.C. § 2000e-2(a)(1). "[T]his includes requiring people to work in a discriminatorily hostile or abusive environment." See Gardner v. CLC of Pascagoula, LLC, 915 F.3d 320, 325 (5th Cir. 2019). A hostile work environment occurs "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21, 114 S.Ct. 367, 370 (1993).

To establish a claim of hostile work environment on the basis of race or sex, a plaintiff must demonstrate that: (1) she belongs to a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment complained of was based on her membership in the protected class (race or sex); (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action. <u>See</u> <u>Hernandez v. Yellow Transp., Inc.</u>, 670 F.3d 644, 651 (5th Cir. 2012) (citing <u>Ramsey v. Henderson</u>, 286 F.3d 264, 268 (5th Cir. 2002)). [17] The court must examine the evidence using a "totality of the circumstances" test that focuses on "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating and whether it unreasonably interferes with an employee's work performance." <u>Turner v. Baylor Richardson Med. Ctr.</u>, 476 F.3d 337, 347 (5th Cir. 2007) (citation omitted). "Although discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to support evidence of a Title VII violation, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory charges that can survive summary judgment." <u>Id.</u> at 347–348 (quotations and citations omitted). Moreover, "to be actionable, the work environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be

---

[17] The Supreme Court distinguishes cases of alleged hostile work environment created by a coworker from those created by a supervisor. <u>See</u> <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 118 S.Ct. 2257 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 118 S.Ct. 2275 (1998). In cases where the alleged harasser is a supervisor the plaintiff is not required to demonstrate the fifth element because the employer may be held vicariously liable for its supervisor's actions without a showing that the employer was negligent. <u>See</u> <u>Watts v. Kroger Co.</u>, 170 F.3d 505, 509 (5th Cir. 1999).

so." Hernandez, 670 F.3d at 651 (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787, 118 S.Ct. 2275, 2283 (1998)).

### A.    On the basis of race

Walmart moves for the dismissal of Plaintiff's hostile work environment claim on the basis of race, arguing that Plaintiff cannot establish several of the elements necessary for a prima facie case. See Record Document 19-1 at 10-11.[18] The Court agrees with this assessment. Plaintiff, a white female, is a member of a protected class, and she has presented evidence that O'Neal subjected her to disturbing and abusive behavior.   As noted above, Plaintiff has also presented evidence that at least one Walmart manager was aware of the pervasive use of the "n" word by the unloaders.   However, Plaintiff has not presented any evidence that the actions of O'Neal or the alleged use of the "n" word by the other unloaders was directed towards her because of her race.   Indeed, Patrick's own deposition testimony indicates that O'Neal's behavior towards her began in response to a specific event – O'Neal's removal from consideration to become a CAP team leader and his replacement with Player. See Patrick Dep. at 81.

Further, the Court doubts that a white person may ever appropriately rely on the use of the "n" word to establish a hostile work environment claim because the slur does not refer to his/her own protected class.   Plaintiff has not provided case law to suggest that this is possible. Finally, there is evidence in the record that suggests Plaintiff did not find the term "nigga" to be either subjectively or objectively offensive.   During her deposition Plaintiff testified several times that she was not offended by the term "nigga" because she considers the term to be "urban

---

[18] The Faragher/Ellerth affirmative defense is not applicable in this case because the alleged harassers were co-workers/subordinates of the Plaintiff, not supervisors.   See Vance v. Ball State, 570 U.S. 421, 428-430, 113 S.Ct. 2434 (2013); Faragher, 524 U.S. at 807; Wyatt v. Hunt Plywood Co., 297 F.3d 405, 411 (5th Cir. 2002).

slang" based on her upbringing in "the hood," and she admitted to using the term herself occasionally outside of work. See id. at 159, 197, 267. [19] It seems incongruous to the Court that one could use a term and find it offensive at the same time. For these reasons, the Court finds that Plaintiff cannot establish a prima facie case of hostile work environment on the basis of race, and this claim must be dismissed.

**B.     On the basis of sex**

Walmart also moves for the dismissal of Plaintiff's hostile work environment claim on the basis of sex. See Record Document 19-1 at 19-21. It is uncontested that Plaintiff is a member of a protected class (female). The parties dispute the remaining factors of Plaintiff's prima facie case.

Plaintiff has alleged that she constantly heard "sex talk" that openly and graphically described sexual matters, although the talk was not directed towards her. See Record Document 1 at ¶11, 13. The deposition testimony in the record supports this allegation. Plaintiff testified that the unloaders made sexual gestures, and would grab their genitals all the time, making comments such as "I'll give you some of this," "Y'all don't want none of this," "You can['t] handle this," and "this is too big for you." See Patrick Dep. at 261.

Several of the unloaders also testified that there was sex talk in the unloading area. See Mario Jones Dep. at 17, 32; Jeremiah Elzie Dep. at 32; Justin Graves Dep. at 15-16. Player

_____

[19] Plaintiff provided an affidavit with her opposition to Walmart's motion for summary judgment wherein she states that she was offended by the use of the "n" word because it was used too often in the work area, which was against Walmart policy. See Record Document 27-8. Walmart argues that this statement contradicts her previous deposition testimony and should not be considered. The Court agrees that Plaintiff has provided a statement in her affidavit which conflicts with her prior testimony without an explanation for the contradiction. See Thurman v. Sears Roebuck & Co., 952 F.2d 128, 136 n. 23 (5th Cir. 1992). However, even if the Court were to consider the statement it does not support the inference that Plaintiff was offended by the term "nigga" in an objective or subjective manner as a racial slur, just by its use at Walmart.

testified that O'Neal used terms such as "bitch" and "pussy," and would comment on female customers, such as "Did you see that bitch. She had a big ass." See Player Dep. at 20, 24-25. Player testified that Plaintiff was present when such comments were made, and Plaintiff tried to get the unloaders to stop by explaining that the comments could be considered harassment. See id. at 25-26. O'Neal never said anything of a sexual nature directly to Plaintiff. See id. Patrick Dep. at 171.

In sex discrimination cases the harassment of women other than the plaintiff is relevant to a claim of a hostile work environment. See Hernandez, 670 F.3d at 653. Indeed, "a woman who was never herself the object of harassment might have a Title VII claim if she were forced to work in an atmosphere in which such sexual harassment was pervasive." Id. (quoting Waltman v. Int'l Paper, 875 F.2d 468 (5th Cir. 1989) (sexual graffiti on walls of a mill's elevator found to be relevant)).

However, to establish a hostile work environment claim the plaintiff must find the behavior both objectively and subjectively offensive. See Hernandez, 670 F.3d at 651. Plaintiff admitted in her deposition that she was not particularly bothered or offended by the unloaders' sexual talk "because it wasn't referred to me," although she did think it was inappropriate. See Patrick Dep. at 267-268, 273. When asked about the unloaders discussing another female co-worker's buttocks, using the term "pussy," and talking about sex with their girlfriends, Plaintiff responded: "I thought it was inappropriate. Did it bother me? No." See id. at 273. These responses indicate that Plaintiff did not find the sex talk to be subjectively offensive. Plaintiff has submitted a sworn declaration in response to the motion for summary judgment wherein she states that she "was very offended by this talk." See Record Document 27-8 at ¶9. This statement is a direct contradiction from her deposition testimony without an explanation, and

cannot be relied upon to create a fact issue. See S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996). Thus, the Court finds that the "sex talk" amongst the unloaders cannot be relied upon by Plaintiff to support her hostile work environment claim.

The remainder of Plaintiff's hostile work environment claim concerns her interactions with O'Neal. In contrast to the sex talk, Plaintiff testified that she was very troubled by her interaction with O'Neal when he called her a "fat bitch" and Player a "dyke bitch" and stated that he would "get y'all bitches in line." See Patrick Dep. at 88. Plaintiff testified that this interaction scared her because she interpreted the comment to be a physical threat. See id. Indeed, she was so troubled by O'Neal's behavior that day that she left work, but returned when Broussard instructed her to do so. See id. at 85-87; Record Document 27-7, Ex. 7. The Court finds that this confrontation with O'Neal, while certainly inappropriate, is not sufficiently severe to create a hostile work environment in this case. Isolated incidents, unless extremely serious, do not amount to a discriminatory change in a term or condition of employment. See Faragher, 524 U.S. at 788. Moreover, the mere utterance of an epithet, while clearly offensive, does not sufficiently affect the terms and conditions of employment. See Harris, 510 U.S. at 21; Higgins v. Lufkin Indus., Inc., 633 F. App'x. 229 (5th Cir. 2015) (coworker referring to plaintiff as a "nigger bitch" and "whore" insufficient). "Title VII was only meant to bar conduct that is so severe and pervasive that it destroys a protected classmember's opportunity to succeed in the workplace." Weller v. Citation Oil & Gas Corp., 84 F.3d 191, 194 (5th Cir. 1996). It is not a general civility code for the American workplace. See Onacle v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 79-81, 118 S.Ct. 998 (2013).

Plaintiff's second confrontation with O'Neal, when he allegedly yelled in her face after he was disciplined for eating on the job, is also insufficient to create a hostile work environment.

For harassment to be relevant to a hostile work environment claim it must occur because of the plaintiff's membership in the class. This incident, as described by the Plaintiff, occurred because O'Neal believed that Plaintiff reported his violation of a Walmart policy, not because of her sex. See Patrick Dep. at 168-169. Plaintiff testified that O'Neal yelled at her and called her a "snitch." See id.

Finally, Plaintiff also testified that O'Neal made the comment "y'all are giving men's jobs to women," and the unloaders made comments about a woman doing a man's job. See id. at 86, 198. There is no indication in the record as to whether Plaintiff found these comments to be offensive to her. However, even if the Court assumes they were offensive to Plaintiff, the comments are neither severe nor pervasive.

Clearly, O'Neal exhibited several examples of inappropriate behavior towards the Plaintiff. However, his behavior does not rise to the level of severe or pervasive necessary to support Plaintiff's claim of a hostile work environment on the basis of sex.

## III. Title VII Retaliation

To establish a prima facie case of Title VII retaliation a plaintiff must demonstrate that (1) she engaged in protected activity, (2) the employer took an adverse employment action against her, and (3) a causal link existed between the protected activity and the adverse employment action. See Baker v. Am. Airlines, Inc., 430 F.3d 750, 754 (5th Cir. 2005). There is no dispute that an adverse employment action occurred in this case. As such, the Court will focus on the first and third factors.

First the Court must consider whether Plaintiff has provided sufficient evidence to demonstrate that she engaged in protected activity. Protected activity is defined as: "opposition to any practice rendered unlawful by Title VII, including making a charge, testifying, assisting,

or participating in any investigation, proceeding, or hearing under Title VII." Ackel v. Nat'l Commc'ns, Inc., 339 F.3d 376, 385 (5th Cir. 2003). The record presents conflicting evidence on this point.

Walmart argues that Patrick's claim for retaliation fails because she cannot establish that she engaged in protected activity. See Record Document 19-2 at 22-23. Walmart contends that none of Plaintiff's reports to her supervisors about the unloaders' behavior nor her June 24, 2016 Global Ethics complaint made any reference whatsoever to race or gender discrimination. See id. at 23. Plaintiff argues that she reported the use of the "n" word by the unloaders to Broussard less than a month before her termination, and again on June 23, 2016. See Record Document 27 at 22.

Plaintiff testified that "way before" her termination she reported the unloaders to Broussard, Thomas, and Tims, noting that the unloaders were using profanity towards each other, not respecting people who walk to the back of the store to empty trash, and "trying to holler" at females who happened to walk in the back room instead of doing their work. See Patrick Dep. at 128-130. However, Plaintiff testified that she didn't believe she told her managers exactly what the unloaders were saying. See id. at 130. Plaintiff's declaration provided in connection with her opposition to the summary judgment motion contradicts this account. Plaintiff declares that she reported the use of the "n" word by the unloaders to Thomas on three separate occasions. See Record Document 27-8. Thomas testified that she has no recollection of Plaintiff reporting O'Neal's foul language, his threats towards her, or the existence of a hostile environment in the back room. See Thomas Dep. at 20-21. Thomas only recalled Plaintiff reporting attendance problems and the lack of work ethic. See id. at 21.

The record shows that Plaintiff also made complaints to Broussard via text message.  See Record Document 27-7, Ex. 7.   However, none of the text messages mention behavior touching upon Title VII.  See id. Rather, the text messages reference O'Neal being disrespectful, and the unloaders "dragging their ass" in unloading a truck, ignoring her instructions, engaging in theft, and taking lunch breaks at the wrong time.  See id.  On June 24, 2016, Plaintiff sent a text to Broussard stating that she was getting ugly looks, cussed out, and she felt threatened.  See id. Plaintiff also alerted Broussard that she called the Global Ethics hotline and she wanted to discuss getting a transfer with the Market Manager.  See id.

The summary of Plaintiff's report on June 24, 2016, to the Global Ethics line indicates that the unloaders were using profanity and were argumentative towards her.  See Record Document 19-4, Ex. AA.  The report also indicates that Plaintiff was extremely uncomfortable, did not feel safe, and she was interested in transferring to a different work location.  See id.   It does not reveal that Plaintiff raised issues of race or sex.  See id. [20]  Plaintiff also notes that when she met with Broussard to discuss the allegations against her she informed Broussard that the unloaders were also using the "n" word.  See Record Document 27 at 22.

Walmart argues that even if Plaintiff engaged in protected activity she cannot establish a causal link between her termination and any protected activity.  See Record Document 19-2 at 22-23.   Plaintiff contends that the causal connection may be inferred from the short time period between her last act of protected activity and her termination.  See Record Document 27 at 22. Temporal proximity between protected activity and the alleged retaliation "may provide the

---

[20] Zuniga, Global Ethics manager, testified that all complaints are reviewed to determine if issues with a protected status (Title VII) are involved.  See Zuniga Dep. at 22-23.  If not, the issue is investigated at the store market level.  See id. at 48.

causal connection required to make out a prima facie case of retaliation." Swanson v. Gen. Serv. Admin., 110 F.3d 1180, 1188 (5th Cir. 2007); Garcia v. Prof'l. Contract Servs., Inc., 938 F.3d 236, 242 (5th Cir. 2019).

However, even if the Court assumes that Plaintiff engaged in protected activity and the temporal proximity of her termination is sufficient to establish a causal connection and her prima facie case, her claim must still be dismissed. If a prima facie case is established the burden shifts to the employer to state a legitimate, nonretaliatory reason for its decision. See Baker, 430 F.3d 754-55. After the employer states its reason, the burden shifts back to the employee to demonstrate that the employer's reason is actually pretext for retaliation. See id. at 755.

As discussed above, Walmart has offered a legitimate nonretaliatory reason for Plaintiff's termination – her substantiated use of the "n" word combined with her disciplinary record. The burden shifts back to Plaintiff to establish that this proffered reason is pretextual and that retaliation was the "but-for" cause for her termination. See Garcia, 938 F.3d at 243; LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 388-89 (5th Cir. 2007). Temporal proximity alone is insufficient to establish "but-for" causation. See Strong v. Univ. Healthcare Sys., LLC, 482 F.3d 802, 808 (5th Cir. 2007). A plaintiff must offer evidence from which a jury could infer that retaliation was the motivation for termination in whole or in part. See Roberson v. Alltel Info. Servs., 373 F.3d 647, 656 (5th Cir. 2004).

Plaintiff has failed to produce any evidence other than temporal proximity to suggest that retaliation was the motivation, in whole or in part, for her termination. Temporal proximity, while certainly relevant to her prima facie case, is not enough to demonstrate pretext. Therefore, the Court finds that summary judgment is appropriate on Plaintiff's retaliation claim.

**CONCLUSION**

Based on the foregoing reasons, Defendant's Motion for Summary Judgment (Record Document 19) is hereby **GRANTED**. Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED**, this 24th day of February, 2020.

_____
DONALD E. WALTER
UNITED STATES DISTRICT JUDGE